UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MELVIN LAVON VIRGIL,

                Plaintiff,

        v.

JENNIFER DARLAK, et al.,

                Defendants.

_____

<u>DECISION & ORDER</u>

10-CV-6479P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Melvin Lavon Virgil ("Virgil") has filed suit against defendants Jennifer

Darlak ("Darlak"), Exigence Hospitalist Medical Services of Erie County, PLLC ("Exigence")

(collectively, "defendants") and Amy Keith ("Keith"), asserting claims under 42 U.S.C. § 1983

for deliberate indifference and state law claims for negligence, gross negligence, negligent

infliction of emotional distress, negligent training and *respondeat superior*.  (Docket # 76).

Virgil's claims arise from his treatment at the Erie County Medical Center ("ECMC")[1] in April

2009.  (*Id.*).  At that time, Keith was a "medical professional" employed by ECMC, and Darlak

was a physician assistant employed by Exigence, a private corporation which had a contractual

duty to provide physician assistants to ECMC.  (*Id.*; Docket # 131 at Exhibit ("Ex.") E at ¶ 3).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case

by a magistrate judge.  (Docket # 129).  Currently before the Court is defendants' motion for

---

[1] Virgil originally sued additional defendants, including ECMC and various John and Jane Doe defendants. (Docket # 1).  Those parties were dismissed by Decision & Order dated January 17, 2012.  (Docket # 55).  Exigence was initially sued as a John Doe Corporation and later substituted as a party.  (Docket ## 56, 76-77).

summary judgment. (Docket # 130). For the reasons discussed below, defendants' motion for summary judgment is granted.

### Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Virgil's Section 1983 claim against Darlak on the grounds that Virgil cannot establish that he was suffering from a serious medical need and, even if he could, he cannot demonstrate that Darlak's conduct rose to the level of deliberate indifference. (Docket # 132 at 4-7). Defendants also move for summary judgment on Virgil's state law claims against Darlak for medical negligence, gross negligence, and negligent infliction of emotional distress on the grounds that Virgil has failed to create an issue of fact as to whether Darlak's conduct was negligent – an element of each of the causes of action. (*Id.* at 7-10). With respect to the *respondeat superior* claim against Exigence, defendants contend that because Darlak's conduct was not negligent, no basis exists to impute liability to her employer and the claim should thus be dismissed. (*Id.* at 11). Finally, with respect to Virgil's claim against Exigence for negligent training, defendants maintain that no issue of fact exists that Darlak was acting within the scope of her employment when she committed the challenged acts and, accordingly, the claim cannot be maintained. (*Id.* at 10-11).

Virgil opposes defendants' motion asserting that he has sufficiently established that he was suffering from a serious medical need and that Darlak's conduct rose to the level of deliberate indifference. (Docket # 134 at 2-6). In addition, Virgil contends that Darlak's conduct so deviated from accepted medical standards that it constituted gross negligence and that defendants are not entitled to summary judgment. (*Id.* at 6). Finally, Virgil initially contended

2

that there was an issue of fact whether Darlak was acting within the scope of her employment precluding summary judgment on the negligent training claim. (*Id.* at 6-7). However, in her affidavit in support of the motion, Darlak asserted that she was employed by Exigence and was acting within the scope of her employment. (Docket # 131 at Ex. E at ¶ 3). Further, counsel for Virgil conceded at oral argument that there was no dispute that Darlak was employed by Exigence.

## A. Factual Background

The following facts are undisputed except where otherwise noted. Virgil was incarcerated in Attica Correctional Facility in April 2009 when the events which give rise to his claim occurred. (Docket # 76 at ¶¶ 5, 10). On April 3, 2009, Virgil was transported to ECMC because he was suffering from chest pains. (*Id.* at ¶ 10). On April 7, 2009, Keith removed a catheter that had been placed in Virgil's arm. (*Id.* at ¶ 12). Virgil noticed that the tip of the catheter had broken off and remained lodged in his arm. (*Id.* at ¶ 13). According to Virgil, he made numerous complaints to various medical staff, including Keith, regarding the catheter tip lodged in his arm, but did not receive any treatment. (*Id.* at ¶¶ 13-16).

Darlak first encountered Virgil later that day, at approximately 7:50 a.m. (Docket # 131 at Ex. E at ¶ 5). Virgil complained of tenderness in his arm and informed Darlak that a piece of the catheter remained in his arm. (*Id.*; Docket # 76 at ¶ 17). Darlak examined Virgil's arm and diagnosed him with phlebitis.[2] (Docket # 131 at Ex. E at ¶ 5). Darlak did not observe any signs of infection, so she decided to discharge Virgil and instructed him to use warm

---

[2] Phlebitis is a clot which forms around an IV site and is common. (Docket # 131 at Ex. F at ¶ 18).

compresses on his arm and to follow up with the physicians at the correctional facility if he noticed any redness or swelling. (*Id.* at ¶ 5).

Before he was discharged, Virgil complained to another unidentified medical staff member concerning the catheter tip in his arm. (Docket # 76 at ¶ 18). As a result, an x-ray was ordered and was performed at approximately 10:52 a.m. on April 7, 2009. (*Id.*; Docket # 131 at Ex. E at ¶ 14). The x-ray results revealed the presence of a foreign object in Virgil's arm. (Docket # 131 at Ex. E at ¶ 14). A Doppler was performed approximately three hours later and confirmed that the foreign object was a piece of the broken catheter. (*Id.*; Docket # 76 at ¶ 18).

Shortly thereafter, at approximately 3:30 p.m., Virgil participated in a consultation to discuss surgery to remove the catheter tip in his arm. (Docket # 131 at Ex. E. at ¶ 14). The surgery was elective, and Virgil's consent to the procedure was necessary to proceed. (*Id.*). Approximately five hours later, at 8:15 p.m., Virgil consented to the surgery. (*Id.*). Because the procedure was elective, it was scheduled for the following morning at 5:00 a.m. (*Id.*). According to Darlak, her failure to diagnose the lodged catheter tip at 7:50 a.m. and the resulting approximately three-hour delay in treatment did not affect the timing of the surgery. (*Id.* at ¶ 14). In other words, even if Virgil had been diagnosed at 7:50 a.m. rather than 10:52 a.m., the surgery still would have been conducted on the morning of April 8, 2009.

In support of her motion for summary judgment, Darlak has submitted an affidavit of Gregory S. Cherr ("Dr. Cherr"), a board-certified vascular surgeon. According to Dr. Cherr, the care and treatment Darlak provided to Virgil was consistent with the applicable standard of care. (Docket # 131 at Ex. F at ¶ 1). Dr. Cherr opines that Darlak's diagnosis of early phlebitis was appropriate based upon Virgil's symptoms and the fact that catheter breaks are "highly

unusual." (*Id.* at ¶ 18).  In addition, Dr. Cherr opines that the catheter tip lodged in Virgil's arm

did not constitute a serious medical need because no evidence exists that the broken catheter tip

was interfering with Virgil's blood flow.  (*Id.* at ¶ 21).  This conclusion is reinforced, according

to Dr. Cherr, by the fact that although the medical tests conducted on April 7 confirmed the

presence of the catheter tip, the surgery was still not performed until the following day.  (*Id.*).

Dr. Cherr opines that even if Darlak had made the accurate diagnosis when she examined Virgil,

the surgery would not have been conducted any sooner.  (*Id.* at ¶ 23).

## B. <u>Discussion</u>

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any

disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

(1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A

fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.

2000).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also

Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the non-moving party must come forward with

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . . [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### 1. **Deliberate Indifference**

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct (1) was "committed by a person acting under color of state law"; and (2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Section 1983 creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, the parties have not disputed that Darlak was acting under color of state law. Rather, the central inquiry is whether her actions violated Virgil's constitutional rights.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 101 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). This standard contains both a subjective and an objective component, as discussed more fully below. *Id.*

### a. **Objective Component**

The objective component asks "whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights." *Sowell v. Chappius*, 695 F. Supp. 2d 16, 20 (W.D.N.Y. 2010); *Smith v. Carpenter*, 316 F.3d at 184 ("a prisoner must first make this threshold showing of serious illness or injury"). "A medical need is 'serious' for constitutional purposes if it presents 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Sowell v. Chappius*, 695 F. Supp. 2d at 20 (quoting *Chance v. Armstrong*, 143 F.3d at 702). The objective inquiry is highly fact specific, and includes the following considerations: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702).

When the allegations concern a delay or interruption in the provision of medical treatment, "the seriousness inquiry is 'narrower,' . . . and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's

underlying medical condition." *Hamm v. Hatcher*, 2013 WL 71770, *8 (S.D.N.Y. 2013)

(quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  Under such circumstances,

"it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care,

rather than the severity of the prisoner's underlying medical condition, considered in the abstract,

that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.  The proper inquiry is

whether the delay "itself was sufficiently harmful to constitute a constitutional violation." *Frank*

*v. Cnty. of Ontario*, 884 F. Supp. 2d 11, 19 (W.D.N.Y. 2012); *see Ferguson v. Cai*, 2012 WL

2865474, *4 (S.D.N.Y. 2012) ("[w]here a claim concerns the temporary delay or interruption in

the provision of medical treatment . . . then the focus shifts to the particular risk of harm faced by

a prisoner due to the challenged *deprivation of care*, rather than the prisoner's underlying

medical condition in the abstract") (internal quotation omitted).  In evaluating the seriousness of

the delay in treatment, "a court may consider the 'absence of adverse medical effects or

demonstrable physical injury' associated with such delay or interruption." *O'Connor v. McArdle*,

2006 WL 436091, *8-9 (N.D.N.Y. 2006) (quoting *Smith*, 316 F.3d at 187), *aff'd*, 217 F. App'x

81 (2007).

A "delay in medical care does not amount to a constitutional claim 'unless the

delay caused substantial harm.'" *Williams v. Raimo*, 2011 WL 6026111, *5 (N.D.N.Y. 2011)

(quoting *Evans v. Manos*, 336 F. Supp. 2d 255, 262 (W.D.N.Y. 2004)).  Thus, a plaintiff must

show either that the underlying medical condition "*actually* worsened as a result of the delay" or

that "very likely future harm" will result from the delay; conclusory allegations of what "might"

have occurred as a result of delay are insufficient. *See DiChiara v. Wright*, 2011 WL 1303919,

*6 (E.D.N.Y.) (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993) and *Smith*, 316 F.3d at 186), *report and recommendation adopted as modified*, 2011 WL 1306867 (E.D.N.Y. 2011).

On the record in this case, I conclude that Virgil has failed to raise a question of fact whether he received constitutionally inadequate medical care. Here, Virgil alleges that during removal of his intravenous catheter, the tip broke off and lodged in his vein in his arm. (Docket # 76). He contends that it "caused significant pain, swelling and interference with his blood flow, and created a risk of death." (*Id*. at ¶ 15). His claim against Darlak arises not from the fact that the tip broke, but from the delay in treating the problem – approximately three hours.

Virgil has failed to present any evidence from which a factfinder could conclude that the delay in diagnosing the lodged catheter tip presented a serious medical need or serious risk to his health. Instead, the facts reveal that Darlak's initial misdiagnosis of phlebitis resulted in, at most, a three-hour delay in diagnosing the lodged catheter tip. Nothing in the record before the Court suggests that the diagnostic delay prolonged Virgil's pain or exacerbated his medical condition. Indeed, the evidence, which Virgil has not refuted, reveals that had Darlak immediately diagnosed the lodged catheter tip, the surgery would not have been conducted any sooner. Virgil has offered no facts to suggest that the delay in treatment presented a substantial risk to his health or that it had any effect on his medical condition or health. Thus, Virgil has not raised any triable issue of fact that the delay in treatment was a sufficiently serious deprivation to fall within the ambit of the Eighth Amendment. *See Ferguson v. Cai*, 2012 WL 2865474 at *4 (delay in medical treatment that resulted in temporary symptoms of pain, blindness and swelling, but did not cause the underlying condition to worsen or alter the effect of the underlying condition on plaintiff's health, did not present a substantial risk of harm); *Pierre v. Cnty. of*

*Broome*, 2007 WL 625978, *5-6 (N.D.N.Y. 2007) (two to three-month delay in provision of proper medication did not present substantial risk of harm where evidence showed that poor blood work results returned to "preferable range"); *Bennett v. Erie Cnty. Holding Ctr. Med. Dep't*, 2006 WL 897817, *8-9 (W.D.N.Y. 2006) (granting summary judgment where plaintiff "offered no persuasive medical evidence that surgery should have been conducted [sooner] or that his offset jaw resulted from the failure to perform such surgery [sooner]"); *Farid v. Ellen*, 2006 WL 59517, *10 (S.D.N.Y. 2006) ("plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"; thus, "no reasonable jury could conclude that the alleged delay in plaintiff's medical treatment caused any harm to him that would be actionable under the Eighth Amendment"), *aff'd in part and vacated in part on other grounds*, 593 F.3d 233 (2d Cir. 2010).

Instead, Virgil offers general, conclusory statements that the lodged catheter tip "caused significant pain [and] swelling" and that it "interfere[d] with his blood flow, and created a risk of death." Such conclusory allegations are insufficient to meet Virgil's burden on this motion, *see Ferguson*, 2012 WL 2865474 at *4 (plaintiff's "general conclusory statements[] that the one-day delay in receiving his medicine put him at an unreasonable risk of future harm" insufficient to defeat summary judgment motion) (internal quotation omitted); *Pierre v. Cnty. of Broome*, 2007 WL 625978 at *6 ("[p]laintiff's 'proof' consists of little more than vague, conclusory statements that 'her health rapidly deteriorated' and 'her life was considerably shortened' . . .[, which is insufficient] to demonstrate that the two to three month delay in treatment implicated a serious medical need"), particularly where they are unaccompanied by any evidence that when Virgil's condition was properly diagnosed, he received medication or

10

treatment that alleviated his pain, *see Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)

("[t]he medical records indicate that the nitroglycerin almost immediately relieved his pain and

lowered his blood pressure, so a jury could find that the defendants' delay caused [plaintiff] six

extra hours of pain and dangerously elevated blood pressure for no good reason").

In any event, the assertion that the lodged catheter tip interfered with blood flow

and presented a risk of death is seriously undermined by the undisputed fact that emergency

surgery was not performed. *See Frank v. Cnty. of Ontario*, 884 F. Supp. 2d at 19 (plaintiff's

contention that his condition was serious and that he needed immediate treatment undercut by the

fact that "surgery did not take place until some weeks after he was discharged . . . suggest[ing]

that plaintiff did not need emergency surgery"). Indeed, elective surgery was scheduled to

commence approximately seventeen hours after the presence of the catheter tip was confirmed by

x-ray. Accordingly, I conclude that Virgil has not presented facts sufficient for any reasonable

factfinder to conclude that the three-hour delay in treatment posed a serious risk to his health.

### b.  Subjective Component

Mere negligence is insufficient to satisfy the subjective component of the Eighth

Amendment analysis; rather, "[a]n official acts with the requisite deliberate indifference when

that official knows of and disregards an excessive risk to inmate health or safety." *Smith*, 316

F.3d at 184 (quoting *Chance*, 143 F.3d at 702). The defendant "must both be aware of the facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." *Davidson v. Harris,* 960 F. Supp. 644, 647 (W.D.N.Y. 1997)

(quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This standard is equivalent to

recklessness in criminal law. *Smith*, 316 F.3d at 184. "[M]ere negligence is not actionable."

*Sowell*, 695 F. Supp. 2d at 20. "Rather, the plaintiff must allege conduct that is 'repugnant to the conscience of mankind' . . . or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Id*. (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06).

Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith*, 316 F.3d at 184. Instead, even where "medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate." *Jordan v. Fischer*, 773 F. Supp. 2d 255, 276 (N.D.N.Y. 2011). Deliberate indifference requires a plaintiff to demonstrate conduct that is "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Murphy v. Corr. Med. Servs.*, 2006 WL 367842, *5 (D. Vt. 2006).

Even if Virgil could establish that he was suffering from a serious medical need, I conclude that Virgil has failed to adduce sufficient facts to raise a triable issue of fact that Darlak's misdiagnosis resulted from a reckless disregard for Virgil's medical needs. The undisputed facts establish that Darlak examined Virgil's arm in response to his complaints and that, based upon her observations and Virgil's reported symptoms, Darlak diagnosed Virgil with phlebitis and provided him with medical instructions to treat and monitor the condition. Although Darlak concedes that she discounted Virgil's contention that a piece of catheter was lodged in his arm, she explained that she did so only because such an occurrence is rare. The mere fact that Darlak did not properly diagnose Virgil's condition, "is insufficient, without more, to satisfy the subjective element of a claim of deliberate indifference to a serious medical need." *See Clark v. Swain*, 2011 WL 6938458, *3 (W.D.N.Y. 2011) (subjective element not established where defendant initially diagnosed plaintiff's ruptured achilles tendon as an ankle sprain),

*report and recommendation adopted*, 2012 WL 11128 (W.D.N.Y. 2012); *Frank*, 884 F. Supp. 2d at 21 ("[t]o the extent that plaintiff alleges that [physician] did not properly diagnose his condition, or its severity, such allegations do not evince culpable recklessness for purposes of the Eighth Amendment") (internal quotation omitted); *Espinal v. Coughlin*, 2002 WL 10450, *4 (S.D.N.Y. 2002) (plaintiff's assertions that defendant "'failed to diagnose the correct information deliberately delaying [p]laintiff's access to treatment' is at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard"); *Irby v. Frisnia*, 119 F. Supp. 2d 130, 132-33 (N.D.N.Y. 2000) (granting summary judgment where defendants, at most, "are guilty of negligence in failing to initially diagnose [plaintiff's] injury, but even this misdiagnosis was based on a reasonable, although incorrect, assessment of [p]laintiff's condition").

## 2. Pendent State Law Claims Against Darlak[3]

Virgil has asserted various state law claims against Darlak, including claims for medical malpractice, gross negligence and negligent infliction of emotional distress. Darlak contends that she is entitled to summary judgment dismissing each of these claims because Virgil has failed to raise a triable issue of fact as to whether Darlak deviated from the applicable standard of care. (Docket # 132 at 7-10).

---

[3] Although the federal claim against Darlak is dismissed, this Court continues to have original jurisdiction over the federal claim asserted against Keith; accordingly, 28 U.S.C. § 1367(c)(3) is not applicable, and the Court will continue to exercise jurisdiction over the state law claims against Darlak and Exigence. *See Soba v. New York City Hous. Auth.*, 2013 WL 3455449, *7 n.10 (S.D.N.Y. 2013). Plaintiff has obtained a default judgment with respect to the claim against Keith, but damages have not been determined. (Docket # 127).

### a. **Medical Malpractice**

Although Virgil has styled his claim as one for "medical negligence," the allegations relate to the provision of medical treatment and should be analyzed as a claim for medical malpractice. *See Richner v. Smithkline Beecham Clinical Labs*, 1996 WL 432473, *1 (S.D.N.Y. 1996) ("[c]onduct that 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment' must be considered medical malpractice rather than general negligence") (quoting *Bleiler v. Bodnar*, 65 N.Y.2d 65, 72 (N.Y. 1985)). "According to New York law, in order to establish a medical malpractice claim, [Virgil] must demonstrate that: (1) [Darlak] departed from accepted standards of medical practice and (2) the departure was the proximate cause of [Virgil's damages]." *Davis v. United States*, 143 F. App'x 371, 372 (2d Cir. 2005).

It is well-settled under New York law that "unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (internal quotation omitted). An exception exists where the "deviation from a proper standard of care may be so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony." *Id.* at 740. This exception is narrow because "the medical malpractice case in which no expert medical testimony is required is 'rare.'" *Id.* (citation omitted). In addition, even in those cases in which the matter is within the knowledge and experience of the ordinary juror, "if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail without introducing expert medical testimony." *Id.*

In support of her motion for summary judgment, Darlak has submitted her own sworn affidavit in which she asserts that her treatment of Virgil was "appropriate [and] consistent with the standard of care." (Docket # 131 at Ex. E at ¶ 13). In addition, Darlak has submitted an affidavit from Dr. Cherr, a licensed physician who is board-certified in general and vascular surgery and who is the General Surgery Program Director at the University of Buffalo. (Docket # 131 at Ex. E at ¶¶ 1-3). Dr. Cherr reviewed Virgil's medical records and concluded "within a reasonable degree of medical certainty, that [Darlak's] care and treatment of [Virgil] was appropriate [and] consistent with the standard of care." (*Id.* at ¶¶ 6, 19). Virgil has not submitted any affidavits, expert or otherwise, in opposition to Darlak's motion for summary judgment. Instead, Virgil relies upon the conclusory allegation contained in his complaint that Darlak "had a duty to care for [Virgil] which she violated by . . . failing to verify [Virgil's] claims . . . and delaying routine determinative diagnosis." (Docket # 76 at ¶ 33).

Virgil's failure to oppose Darlak's motion for summary judgment with expert medical evidence warrants dismissal of his medical malpractice claim. Even if Darlak's conduct was of the nature which an ordinary jury could determine constituted a deviation from acceptable standards, Darlak's submission of Dr. Cherr's affidavit, coupled with Virgil's failure to present any expert medical evidence in opposition, entitle Darlak to summary judgment dismissing the medical malpractice claim. *See Urena v. Wolfson*, 2012 WL 958529, *7 (E.D.N.Y. 2012) (granting defendant summary judgment dismissing medical malpractice claim where defendant proffered affidavit of a board-certified doctor opining that the defendant provided treatment within accepted standards and plaintiff failed to submit any expert medical evidence in opposition); *see Bender v. Lowe*, 2011 WL 4001147, *12 (S.D.N.Y. 2011) (granting summary

judgment where plaintiff failed to submit competent expert evidence and where defendant submitted an expert affidavit "asserting that [d]efendants followed generally accepted medical standards").

### b. <u>Gross Negligence</u>

Under New York law, gross negligence, like ordinary negligence, requires evidence of the defendant's breach of a duty owed to the plaintiff. *See Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998). However, unlike ordinary negligence, gross negligence requires a showing that the defendant's conduct "evince[d] a reckless disregard for the rights of others or smack[ed] of intentional wrongdoing." *See id.* (quoting *AT & T Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)); *see Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 382 (E.D.N.Y. 2011) ("[u]nder New York law, gross negligence is defined as 'conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing") (quoting *Colnaghi, USA, Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (N.Y. 1993)). Thus, to prevail on a claim for gross negligence under New York law, "a plaintiff must demonstrate that the defendant owed the plaintiff a duty and the defendant failed to exercise 'even slight care' in the discharge of that duty." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 473 (S.D.N.Y. 2012) (quoting *Food Pageant, Inc. v. Consol. Edison Co.*, 54 N.Y.2d 167, 172 (N.Y. 1981)).

On the record before the Court, no evidence exists on which a reasonable juror could find that Darlak's conduct, even if it departed from accepted standards of care, rose to the level of recklessness required to establish a claim for gross negligence. The undisputed facts establish that Darlak examined Virgil's arm, diagnosed his condition based upon her experience and his reported symptoms, and provided him with instructions for his condition. That Darlak's

16

diagnosis was ultimately determined to be an error, is insufficient, without more, to demonstrate

that Darlak's conduct "evince[d] a reckless disregard for the rights of [Virgil] or smack[ed] of

intentional wrongdoing." *See Curley v. AMR Corp.*, 153 F.3d at 13. Indeed, the undisputed

evidence demonstrates that Darlak exercised at least "slight care" in the discharge of her duties to

Virgil and, accordingly, is entitled to summary judgment dismissing the claim for gross

negligence. *See Dilworth v. Goldberg*, 914 F. Supp. 2d at 473 (granting dismissal of gross

negligence claim premised upon conclusory allegation of intentional misdiagnosis and

disagreement with medical treatment provided).

### c. Negligent Infliction of Emotional Distress

A claim for negligent infliction of emotional distress cannot be asserted if it is

"essentially duplicative of tort or contract causes of action." *Djangmah v. Falcione*, 2013 WL

208914, *9 (S.D.N.Y.) (quoting *Wolkstein v. Morgenstern*, 275 A.D.2d 635, 637 (1st

Dep't 2000)), *report and recommendation adopted*, 2013 WL 1195261 (S.D.N.Y. 2013);

*Deronette v. City of New York*, 2007 WL 951925, *5 (E.D.N.Y. 2007) ("a claim for negligent

infliction of emotional distress should be dismissed where the conduct for the underlying claim

may be redressed by way of traditional tort remedies"). The rationale for this rule is grounded in

the underlying purpose of the common law tort of negligent infliction of emotional distress

which "has its roots in the acknowledgment by the courts of the need to provide relief in those

circumstances *where traditional theories of recovery do not*." *Lee v. McCue*, 410 F. Supp. 2d

221, 226-27 (S.D.N.Y. 2006) (quoting *Shelia C. v. Povich*, 11 A.D.3d 120, 130 (1st Dep't

2004)), *appeal dismissed*, 218 F. App'x 26 (2007).

In order to establish a claim for negligent infliction of emotional distress, the plaintiff must establish a "breach of a duty owed to plaintiff which either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." *Id.* (quoting *Shelia C. v. Povich*, 11 A.D.3d at 130). In addition, "the defendant's conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Banker v. Cnty. of Livingston*, 782 F. Supp. 2d 39, 50 (W.D.N.Y. 2011) (quoting *Burger v. Singh*, 79 A.D.3d 1086, 1088 (2d Dep't 2010)); *see Djangmah v. Falcione*, 2013 WL 208914 at *9 (same); *Dilworth*, 914 F. Supp. 2d at 473 (same); *Bono v. Monarch Life Ins. Co.*, 2006 WL 839412, *4 (W.D.N.Y. 2006) ("a cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by a defendant that is 'so outrageous in character'") (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993)). "Ordinarily, whether the challenged conduct is sufficiently outrageous will be determined as a matter of law." *Rizzo v. Edison, Inc.*, 419 F. Supp. 2d 338, 349 (W.D.N.Y.), *reconsideration denied*, 2005 WL 1377904 (W.D.N.Y. 2005), *aff'd*, 172 F. App'x 391 (2d Cir. 2006).

The conduct that provides the basis for Virgil's claim for negligent infliction of emotional distress is the same conduct underlying his claim for medical malpractice. (*Compare* Docket # 76 at ¶¶ 27-30 *with* ¶¶ 31-34). Accordingly, his claim for negligent infliction of emotional distress is subject to dismissal. *See Djangmah*, 2013 WL 208914 at *10 (dismissing claim for negligent infliction of emotional distress where it was duplicative of excessive force claim); *Deronette v. City of New York*, 2007 WL 951925 at *5-6 (dismissing negligent infliction

of emotional distress claim where it was duplicative of tort claims).  In any event, as discussed in connection with Virgil's claims for deliberate indifference and gross negligence, Darlak's conduct in connection with her treatment of Virgil does not rise to the level of "outrageousness" required to establish a claim for negligent infliction of emotional distress.

### 3. <u>Pendent State Law Claims Against Exigence</u>

Virgil has asserted claims against Exigence based on theories of negligent training and *respondeat superior*.  Exigence asserts that the claim against it for negligent training must be dismissed because there is no issue of fact that Darlak was acting within the scope of her employment and, accordingly, a claim for negligent training cannot stand.  In addition, Exigence maintains that dismissal of the underlying claims against Darlak mandates dismissal of the *respondeat superior* claim.

"It is well settled under New York law that '[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting *outside* the scope of [his] employment.'"[4]  *Perkins v. City of Rochester*, 641 F. Supp. 2d 168, 174-75 (W.D.N.Y. 2009) (quoting *Stokes v. City of New York*, 2007 WL 1300983, *14 (E.D.N.Y. 2007)).  The rationale for this rule is that when an employee is acting within the scope of her employment, the employer's liability for her conduct will be imposed under the theory of *respondeat superior*, and recovery against the employer for negligent hiring, training or retention is unnecessary.  *See id.*; *see also Mahar v. U.S. Xpress Enters., Inc.*, 688 F. Supp. 2d at 110.  Although Virgil initially

---

[4]  A limited exception to this rule exists where the plaintiff "is seeking punitive damages from the employer based on gross negligence in hiring, training or supervising the employee."  *See Mahar v. U.S. Xpress Enters., Inc.*, 688 F. Supp. 2d 95, 110 (N.D.N.Y. 2010).  The complaint is devoid of any allegation of gross negligence on the part of Exigence and, therefore, this exception is not applicable.  *See Akhalia v. Guardia*, 2013 WL 2395974, *6 (E.D.N.Y. 2013) (exception not applicable where plaintiff has not alleged gross negligence in the hiring or retention of the employee).

contended that there was an issue of fact whether Darlak was acting within the scope of her employment with Exigence when she treated Virgil, counsel for Virgil conceded at oral argument that no issue of fact existed with respect to Darlak's employment.  Accordingly, Exigence is entitled to summary judgment dismissing the claim for negligent training.  *See Velez v. City of New York*, 2012 WL 1237646, *5 (E.D.N.Y. 2012) ("[n]or can there be any doubt that the great weight of authority teaches that a negligent training claim is viable under New York law *only* when the alleged wrongful conduct occurred outside the scope of employment"); *Perkins v. City of Rochester*, 641 F. Supp. 2d at 175 ("[t]here is no dispute that [defendant] was acting within the scope of his employment as a City police officer during the incident . . . , and thus plaintiff's claims of negligent hiring, training and supervision must be dismissed"); *Biggs v. City of New York*, 2010 WL 4628360, *10 (S.D.N.Y. 2010) (dismissing claim for negligent hiring or retention against employer where there was no issue of fact that defendants were acting within the scope of their employment).

Finally, Exigence is entitled to summary judgment dismissing Virgil's claims under the theory of *respondeat superior* because all of the claims against Darlak that could support the *respondeat superior* claim have been dismissed.  *See Harsco Corp. v. Segui*, 91 F.3d 337, 349 (2d Cir. 1996) ("[f]urthermore, there being no surviving underlying theory of liability, the respondeat superior claims were also properly dismissed"); *Stevens v. City of New York*, 2012 WL 5862659, *4 n.6 (S.D.N.Y. 2012) ("[w]here there is no surviving underlying theory of liability, the responde[a]t superior claims must be dismissed") (internal quotation omitted); *Kogut v. Cnty. of Nassau*, 2009 WL 2413648, *17 (E.D.N.Y.) ("[b]ecause the theory of respondeat superior is not a stand-alone cause of action, but rather a claim that requires a finding

of an underlying wrong . . .[,] [the] respond[e]at superior claims are also dismissed"),

*reconsidered in part*, 2009 WL 5033937 (E.D.N.Y. 2009).


## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment (**Docket # 130**) is **GRANTED**.  The Clerk of the Court is directed to enter judgment in favor of defendants Darlak and Exigence.

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
August   6  , 2013